UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANGELA BAGGETT,

              Plaintiff,                          Hon. Sally J. Berens

v.                                             Case No. 1:23-cv-85

PAUL BAILEY, et al.,

              Defendants.

_____/

**OPINION**

Plaintiff Angela Baggett, a former deputy with the Berrien County Sheriff's Department (BCSD), has sued Sheriff Paul Bailey and Berrien County alleging claims arising out her employment. Baggett alleges: (1) sex discrimination in violation of the Fourteenth Amendment's Equal Protection Clause (Count I), Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* (Count II), and the Michigan Elliott–Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws. § 37.2101 *et seq.* (Count III); and (2) retaliation in violation of the First Amendment (Count IV), Title VII (Count V), and ELCRA (Count VI).[1]

---

[1] Baggett alleges an additional count, Count VII, for injunctive relief, which is a remedy rather than a cause of action. *See Thompson v. JPMorgan Chase Bank, N.A.*, 563 F. App'x 440, 442 n.1 (6th Cir. 2014).

Now before the Court is Defendants' Motion for Summary Judgment.[2] (ECF No. 27.) For the following reasons, the Court will grant the motion and dismiss Baggett's complaint with prejudice.[3]

## I.   Background

### A.   Baggett's Tenure with BCSD

Baggett became employed as a deputy with the BCSD on August 5, 2013. She initially worked in the jail but moved to road patrol in May 2014. (ECF No. 1 at PageID.4; ECF No. 27-2 at PageID.152, 159.) For much of her time as a road patrol deputy, Baggett was assigned to the Niles Township area. (*Id.* at PageID.170–71; ECF No. 27-6 at PageID.213.) Niles Township is one of the busier areas in Berrien County and accounts for approximately 25% of the call volume to the BCSD. (ECF No. 27-2 at PageID.170; ECF No. 27-6 at PageID.213.)

While employed as a full-time deputy with the BCSD, Baggett also worked part-time as a police officer for various municipalities, including the City of Buchanan. (ECF No. 27-2 at PageID.151–52.) In May 2022, Baggett obtained full-time employment with the City of Buchanan Police Department and submitted a letter of resignation to Bailey shortly thereafter. (*Id.* at PageID.155, 173.) She put the letter on Sheriff's Office letterhead and sent it from her County email address. (*Id.*; ECF No. 27-10 at PageID.236.) She explained that her resignation was based on her desire "to work in a better work environment," citing, among other things, "[t]he lack of accountability from some administration and the lack of accountability of other deputies." (*Id.*) On

---

[2]  Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the Court conduct all further proceedings in this case, including entry of judgment.

[3]  Although Defendants have requested oral argument, the Court finds that oral argument is unnecessary as the parties' briefs adequately develop the issues in contention.

June 14, 2022, Bailey notified the Michigan Commission on Law Enforcement Standards that Baggett had resigned in good standing. (ECF No. 27-11.)

On June 23, 2022, the County's Human Resources Department sent Baggett an "exit interview" questionnaire that it routinely sends to all employees who resign from County employment, which it uses to gather information on opportunities to improve retention and engagement of current and future employees. (ECF No. 27-2 at PageID.174; ECF No. 27-8 at PageID.227; ECF No. 28-1.) Baggett completed the "exit interview" and returned it to the County. In responding to the question about what she liked least about her position, Baggett cited "[t]he toxic work environment and corruption that is going on within the administration," and said she was leaving because of the "Good Old Boys Club" environment, including nepotism, and the administration's "lack of honesty, morals, and integrity." (*Id.* at PageID.244.) On July 21, 2022, Bailey revoked Baggett's "deputy card"—an identification card displaying the holder's oath of office that allows him or her to make arrests throughout the County. (ECF No. 27-2 at PageID.178; ECF No. 27-6 at PageID.216–17 ECF No. 28-4.) Bailey wrote a letter to Tim Ganus, Director of Public Safety for the City of Buchanan Police Department, notifying him of the revocation. (ECF No. 28-2.)

### B.     Baggett's Allegations of Sex-Based Hostility and Favoritism

Baggett alleges that, during her employment as a deputy, she observed and experienced "a culture of overt sexism and blatant hostility to female deputies" (ECF No. 1 at PageID.4), based on the following incidents.

### 1.     Incidents Involving Sgt. Shawn Yech

Baggett cites several incidents of sexism from 2016 involving Sgt. Yech. First, she alleges that on January 20, 2016, Sgt. Yech made an inappropriate sexual comment about a female deputy during dinner at a restaurant with Baggett and another deputy. (ECF No. 1 at PageID.5.) Next, on

3

February 4, 2016, while Baggett and Sgt. Yech were at the scene of a traffic accident, Baggett was assigned to direct traffic around the damaged vehicles. Sgt. Yech said to Baggett, "You got this?" in a demeaning tone as if he believed that Baggett was incapable of performing her duties. As they were leaving the scene, Sgt. Yech slammed his body into Baggett with enough force to send her staggering. Baggett asked Sgt. Yech, "What was that?" but he did not respond. (*Id.* at PageID.4–5.) On September 27, 2016, Sgt. Yech wrote a letter to Captain Boyce documenting "performance issues" of three deputies on the Niles Township afternoon shift. At the time, Baggett and two other female deputies were assigned to that shift. (ECF No. 1 at PageID.5; ECF No. 27-2 at PageID.165; ECF No. 28-10.) The letter did not mention Baggett by name but suggested that the deputies on that shift could benefit from additional training. Sgt. Yech did mention one deputy by name and suggested that she be moved to a different patrol location to address her time management issues. (*Id.*)

After Baggett learned of Sgt. Yech's letter, she sent a formal complaint to the County's Human Resource Director, Shelly Jasper, complaining about Sgt. Yech's bullying and harassment, as well as his inappropriate sexual comment. (ECF No. 28-11 at PageID.311–12.) Jasper advised Baggett that, because her complaint concerned a Sheriff's Department employee, she should file her complaint directly with Bailey or Undersheriff Heit to allow her chain-of-command to directly address the issues. (ECF No. 27-8 at PageID.227; ECF No. 28-11 at PageID.310.) Thereafter, Baggett submitted her complaint to the Sheriff's Office, and Undersheriff Heit and Chief Deputy Boyce investigated the issues. (ECF No. 27-7 at PageID.220.) The investigation found insufficient evidence to substantiate Baggett's claims. (ECF No. 28-12.)

### 2.    Backup Response Times

In September 2021, Baggett complained that she was having difficulty getting dispatch to respond to her requests for emergency backup on calls. She believed that these delays were

becoming more common for female deputies, while male deputies did not experience the same issue with their requests. (ECF No. 1 at PageID.7; ECF No. 27-2 at PagID.172.) Baggett did not file a formal complaint but did share her concerns with BCSD command staff. (*Id.* at PageID.173; ECF No. 27-6 at PageID.214.) The Sheriff's Office investigated her allegations at the time she raised them but found no evidence that Baggett's or other female deputies' requests for backup were being treated differently than male deputies' requests.[4] (*Id.*; ECF No. 27-7 at PageID.222–23.)

### 3.   Reassignment of Overtime Work

In early 2022, Baggett signed up to work an overtime shift in the South County area. She alleges that Lt. Zehm forced or attempted to force her out of this assigned area and to work the busier Niles Township area so that his male deputies did not have to work that area. She alleges that this situation occurred more than once. (ECF No. 1 at PageID.8; ECF No. 27-2 at PageID.163–64.) Baggett complained about the situation to Captain Miller, who spoke to Undersheriff Heit about the situation. (*Id.* at PageID.163; ECF No. 27-7 at PageID.223.) Undersheriff Heit told Captain Miller to direct Lt. Zehm to allow Baggett to work the South County overtime shift for which she had volunteered. It appears that on at least one occasion, Baggett actually worked the South County overtime shift and that in another instance she was reassigned to Niles Township. (ECF No. 27-2 at PageID.163–64; ECF No. 27-7 at PageID.223.) However, she does not allege that she was denied overtime.

---

[4] Baggett cannot recall other female deputies making similar complaints, and she concedes that she has no evidence to support her assertion of disparity in response times between male and female deputies. (ECF No. 22-7 at PageID.172–73, 179.)

### 4.    November 2021 Suspension

On November 8, 2021, the Sheriff's Office needed to fill two overtime positions on the afternoon shift to meet the minimum staffing requirement. (ECF No. 28-6 at PageID.281–82.) Pursuant to the Sheriff's Office overtime policy, overtime shifts are first offered to deputies who are currently working their shifts based on seniority. If a volunteer from the current shift cannot be obtained, the supervisor or officer in charge must try to call other qualified employees to fill the open shift. If a volunteer cannot be found, the person with the lowest seniority on the previous shift (prior to the overtime shift) is required to work overtime. (*Id.* at PageID.275.)

Baggett worked her normal shift on November 8 but had signed up to teach a class in the evening after her shift ended. (ECF No. 1 at PageID.8.) Lt. Zehm, the supervisor on duty that day, sought volunteers for the open shift but found none. Therefore, he initiated the forced overtime policy. (ECF No. 28-6 at PageID.281.) Lt. Zehm filled one spot with Deputy Phillips, a male who was the least senior on the shift, and contacted Baggett, the second least senior on the shift, to notify her that she would be required to work overtime. Baggett told Lt. Zehm that she was scheduled to teach a class and would not miss it to work the overtime shift. Baggett told Lt. Zehm that she would use a sick day. When Baggett later informed Lt. Johnson of her intent to use a sick day to teach the class, he advised her that she would likely be written up if she did that. Baggett told Lt. Johnson that "she did not care" and would "just turn her stuff in." (*Id.* at PageID.272, 281.) Baggett's absence was recorded as unexcused because it was not an appropriate use of sick time. (*Id.* at PageID.268.)

On November 28, 2021, Baggett was suspended for two days without pay for insubordination and violation of policy. (*Id.*) On December 1, 2021, she filed a grievance regarding the suspension. (*Id.* at PageID.282–83.) On January 20, 2021, the parties agreed to settle the grievance by reducing the two-day suspension to one day. (*Id.* at PageID.264.)

6

C.     **Baggett's EEOC Complaints**

Baggett filed two charges of discrimination with the Equal Employment Opportunity Commission (EEOC) regarding her employment with BCSD. First, on March 15, 2022, she filed a complaint concerning the November 8, 2021 forced overtime incident, asserting that it was motivated by sex-based discrimination. (ECF No. 1 at PageID.9.) The EEOC issued Baggett a Determination and Right to Sue (RTS) Letter on June 24, 2022. (ECF No. 28-8.) The 90-day period for filing a lawsuit in federal or state court set forth in the RTS letter expired on September 24, 2022.

Baggett filed a second charge on November 3, 2022, alleging that Bailey revoked her deputy card due to sex discrimination and retaliation. (ECF No. 1 at PageID.11; ECF No. 28-9 at PageID.305.) The EEOC issued Baggett a RTS letter on November 15, 2022. (*Id.* at PageID.301.)

## II.  Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th

Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).[5]

### III. Discussion

#### A. Discrimination

As noted above, Baggett alleges sex discrimination claims under the Fourteenth Amendment, Title VII, and ELCRA. As an initial matter, Defendants contend that Baggett's Title VII discrimination claim is barred in two respects. First, they note that, because Michigan is a deferral state under Title VII, Baggett was required to file a charge with the EEOC within 300 days of the date the alleged unlawful practice occurred. 42 U.S.C. § 2000e-5(e)(1); *see Schoneboom v. Michigan*, 28 F. App'x 504, 505 (6th Cir. 2002) (citing 42 U.S.C. § 2000e–5(e) and *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 111 (1988)) ("In a deferral state such as Michigan, a charge of discriminatory conduct must be filed with the Equal Employment Opportunity Commission (EEOC) within 300 days after the alleged unlawful act occurs."). Defendants contend that because Baggett did not file her first charge until March 15, 2022, she may not bring a claim for activities that occurred more than 300 days prior to that date, or May 19, 2021. Defendants further contend that Baggett's Title VII discrimination claim based on the November 8, 2021 forced overtime incident is barred because Baggett failed to file suit within 90 days of receipt of the RTS letter from the EEOC (applying the presumption of receipt five days after mailing). *See Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th Cir. 2000).

Baggett does not dispute that her Title VII discrimination claim based on the forced-overtime incident is barred by the 90-day limitations period. Therefore, she has abandoned that

---

[5] Defendants cite *Scott v. Harris*, 550 U.S. 372 (2007), in the standard of review portion of their brief. *Scott*, which involved a videotape of the incident in question—a car chase—is inapplicable here as there is no evidence of a similar nature that, by itself, forecloses Baggett's allegations.

claim. *See Lamar v. Procter & Gamble Dist. LLC*, No. 13-CV-13380, 2015 WL 1530669, at *21 (E.D. Mich. Apr. 6, 2015) (concluding that the plaintiff abandoned her FMLA interference claim by her failure to dispute the defendant's assertion that she failed to cite any fact supporting such claim). She notes, correctly, that her Section 1983 and ELCRA claims are not time-barred because she filed them within the three-year limitations periods applicable to those claims.

Bagget also contends that she may rely on events that occurred outside the limitations period, including Sgt. Yech's alleged conduct, because she has alleged "ongoing, systemic gender-based discrimination and harassment throughout her employment with [BCSD]." (ECF No. 30 at PageID.396) This argument lacks merit. The case Baggett cites for this proposition, *Marotta v. Ford Motor Co.*, No. 14-CV-11149, 2015 WL 5336202 (E.D. Mich. Sept. 14, 2015), addressed acts occurring outside the limitations period as evidence of a pattern of discrimination in a sexual harassment case; it was not a case alleging that discrete employment actions were discriminatory. *Id.* at *2 ("The court's consideration of all of the alleged harassment in context, including the acts occurring outside of the limitations period, is proper."). Here, because Baggett has not alleged a sexual harassment claim, she cannot rely on acts occurring outside the limitations period. *Cf. Khatri v. Ohio State Univ.*, No. 21-3193, 2022 WL 620147, at 4 (6th Cir. Jan. 25, 2022) ("When a Title VII claim is based on discrete acts of discrimination, 'the continuing violation doctrine may not be invoked to allow recovery for acts that took place outside the filing period.'" (quoting *Sharp v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003)). Moreover, Sgt. Yech's alleged conduct was years removed from the forced-overtime incident, and he was neither a decisionmaker nor involved in any aspect of that incident. *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012).

Turning to the merits of the discrimination claim, Fourteenth Amendment and ELCRA disparate treatment claims are analyzed in the same manner as Title VII claims. *See James v. Hampton*, 592 F. App'x 449, 459–60 (6th Cir. 2015) (Title VII and equal protection claims); *Gielda v. Bangor Twp. Schs.*, 505 F. App'x 550, 555 (6th Cir. 2012) (Title VII and ELCRA claims). A plaintiff may establish a prima facie case of discrimination by introducing either credible, direct evidence of discriminatory intent or by circumstantial evidence through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Because Baggett presents no direct evidence of discrimination, she must establish her claim through the *McDonnell Douglas* framework, which involves three steps:

> [T]he plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. If the plaintiff does so, the defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. Finally, if the defendant succeeds in this task, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.

*Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (cleaned up). To establish a prima facie case of sex discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly-situated male employees for the same or similar conduct. *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992)).

Although Baggett can establish the first three elements of a prima facie case, her claim fails on the fourth element because she fails to present admissible evidence demonstrating that she was treated differently than a similarly-situated comparator. Baggett limits the alleged adverse action on which she bases her discrimination claim to the discipline she received for her refusal to work

the November 8, 2021 forced overtime.[6] (ECF No. 30 at PageID.397–98.) To be similarly-situated, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). "[R]ather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the relevant aspects.'" *Id.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994), abrogated on other grounds by *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) (emphasis added)). As the Sixth Circuit has explained:

> [T]o be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell*, 964 F.2d at 583 (citation omitted). A plaintiff may not establish the particulars of a comparator's conduct through hearsay or speculation. Rather, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(d); *see also Muringai v. Frito-Lay, Inc.*, 2:12-cv-1086, 2014 WL 5469867, at *6 (S.D. Ohio oct. 28, 2014) (noting that the plaintiff's failure to demonstrate first-hand knowledge regarding comparators was fatal to his response opposing the defendant's motion for summary judgment).

---

[6] Baggett's failure to respond to Defendants' arguments that she did not establish adverse action based on denial of an overtime pay request and constructive discharge amounts to a waiver of any argument that those grounds are adverse action supporting her claim. *See Akaazua v. Walker Novak Legal Grp., LLC*, No. 19-2183, 2021 WL 4097500, at *1 (6th Cir. Jan. 8, 2021) (holding that the plaintiff's failure to respond to the defendants' motions to dismiss constituted a waiver of any argument that dismissal was improper).

First, as noted, summary judgment is proper because Baggett fails to present admissible comparator evidence. Her deposition testimony demonstrates that she has no personal knowledge about the circumstances of the comparators she cites in her verified complaint or in her response and instead relies on what she learned from others. (ECF No. 27-2 at PageID.164, 167–69.) Second, as set forth below, the proposed comparators are not similar because none of them refused to work an overtime shift and improperly used sick time:

- <u>Lt. Johnson</u>. Baggett claims that while on his shift, Lt. Johnson left his service area to attend his grandchild's sporting event but was not disciplined.
- <u>Deputy Hopkins</u>. Baggett alleges that Deputy Hopkins was permitted to use sick time for his regular shift but later the same day was allowed to work overtime. Baggett has no information regarding his use of sick time, i.e., attendance at a doctor's appointment. (ECF No. 27-2 at PageID.167.)
- <u>Deputy Haskins</u>. Baggett alleges that he called in sick and then took his wife to get a tattoo. She bases this allegation on the date of a Facebook post made the same day he took sick leave. The Sheriff's Office investigated the matter and determined that Deputy Haskins' wife did not get the tattoo the same day he called in sick. (ECF No. 27-7 at PageID.221.)
- <u>Deputy Cluster</u>. Baggett alleges, based on a social media post, that Deputy Cluster misused sick time to go deer hunting. The Sheriff's Office investigated the matter and determined that Deputy Cluster had not gone deer hunting while on sick leave. (*Id.*)
- <u>Deputy Woerdehoff</u>. On October 13, 2021, in attempting to fill staffing for the afternoon shift, Deputy Bowman called Deputy Woerdehoff and told him that he would have to work the afternoon shift. Deputy Woerdehoff responded, "Fuck that, I'm not staying, this is bullshit." He also threatened to call the undersheriff if he was forced to work the overtime shift. (ECF No. 28-15 at PageID.327.) Deputy Woerdehoff was disciplined and given a one-day suspension for insubordination based on his comments to Deputy Bowman. (*Id.* at PageID.326.) While Deputy Woerdehoff's response was unacceptable, the investigation revealed that he was not the next person in line to work the forced overtime because there were other deputies with less seniority. (ECF No. 27-7 at PageID.222.) In addition, the investigation indicated that Deputy Woerdehoff was still going to work the forced overtime if he had been ordered to do so. (*Id.*)
- <u>Deputies Woerdehoff and Culberson</u>. Baggett alleges that, at some point, while working in the jail, Deputies Woerdehoff and Culberson failed to open a door when a Benton Harbor officer pushed the buzzer for help. She alleges they were not disciplined.

As indicated, each of these comparators presented different circumstances. Lt. Johnson is not similarly situated to Baggett because he is of a higher rank and there is no indication that he disobeyed a direct order, misused or violated the sick time or overtime policies, or went off duty. Deputies Hopkins, Haskins, and Cluster did not refuse to work forced overtime and then violate the sick time policy. While Deputy Woerdehoff used inappropriate language in response to a request that he work overtime, he was correct that he was not next in line to work overtime under the policy, and he was still willing to work if he was actually forced. In addition, Baggett was not treated differently than Deputy Woerdehoff, as ultimately they both received one-day suspensions, although for different behavior. As for the jail situation involving Deputies Woerdehoff and Culberson, it is clearly distinguishable from Baggett's circumstances.

Finally, even if Baggett had failed to establish a prima facie case, her claim would still fail because she has presented neither argument nor evidence to establish that Defendants' proffered legitimate reason—violation of BCSD policies—was pretext.

## B.    Retaliation under Title VII and ELCRA

Baggett alleges that Defendants retaliated against her under both Title VII and ELCRA by failing to honor her requests for backup while on patrol in the field and revoking her deputy card. Retaliation claims under Title VII and ELCRA are analyzed under the same standards. *Jackson v. Genessee Cnty. Road Comm'n*, 999 F.3d 333, 343 (6th Cir. 2021). Circumstantial retaliation claims under Title VII are evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) the employer was aware of her protected activity; (3) she suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020). If the plaintiff establishes a prima

facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the action. *Id.* If the defendant meets its burden, the plaintiff must then demonstrate that the proffered reason was pretextual. *Id.* This entails a showing that the defendant's proffered reason: (1) has no basis in fact, (2) did not actually motivate the adverse action, or (3) was insufficient to motivate the adverse action. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). If a plaintiff can show that the defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination. *Id.* "Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff at all times." *Id.*

### 1. Protected Activity

Title VII and ELCRA both prohibit retaliatory conduct in two sets of circumstances: (1) when an employee "has made a charge, testified, assisted, or participated in any manner an investigation, proceeding, or hearing"; and (2) when an employee "oppose[s] any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a); Mich. Comp. Laws § 37.2701(a). These circumstances are generally referred to as "participation clause" and "opposition clause" activities. Although both types of activity are protected under Title VII, the Sixth Circuit has observed that "[t]he distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989). Under the participation clause, protection "extends to persons who have 'participated in any manner' in Title VII proceedings." *Id.* (citing *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1006 (5th Cir. 1969)). In contrast, the protection afforded under the opposition clause is more limited. "An employee is not protected when he violates legitimate rules and orders of his employer, disrupts

14

the employment environment, or interferes with the attainment of his employer's goals." *Id.* In addition, a non-specific complaint to an employer amounting to "a vague charge of discrimination . . . is insufficient to constitute opposition to an unlawful employment practice." *Id.* at 1313.

Baggett alleged the following as protected activity in her complaint: (1) her grievance concerning the discipline imposed for her refusal to work forced overtime in November 2021; (2) her March 15, 2022 charge of discrimination; (3) her March 16, 2022 resignation letter; and (4) her November 3, 2022 charge of discrimination. (ECF No. 1 at PageID.17.) In her response, she adds her November 7, 2016 complaint regarding Sgt. Yech and her exit interview responses.[7] (ECF No. 30 at PageID.401.)

To begin, Baggett's March 15, 2022 and November 3, 2022 charges of discrimination are both protected activity under the participation clause, although only the March 15, 2022 charge can be relevant to a retaliation claim based on the facts at issue. The remainder of the conduct must be assessed as opposition activity because it was not related to a Title VII proceeding. First, Baggett's November 7, 2016 complaint regarding bullying and harassment by Sgt. Yech arguably can be considered opposition clause activity because Baggett complained about harassment and cited Sgt. Yech's inappropriate sexual comment about another deputy.[8] Next, Baggett fails to

---

[7] Baggett does not argue that other complaints she mentions in her complaint and summary judgment response amounted to protected conduct, including her complaints about difficulty getting backup, being forced out of overtime areas, and not receiving overtime pay on one occasion. She also fails to present evidence showing that these verbal complaints amounted to protected opposition activity.

[8] Defendants contend that Baggett may not rely on protected activity that falls outside of Title VII's 300-day period or ELCRA's three-year statute of limitations. (ECF No. 31 at PageID.463.) They cite no support for this proposition. In *Dibbern v. University of Michigan*, No. 12-15632, 2013 WL 6068808 (E.D. Mich. Nov. 18, 2013), which involved a Title IX retaliation claim, the court rejected the defendants' argument that the protected conduct must occur within the limitations period. The court reasoned that in a retaliation claim, the injury which gives rise to the claim is the retaliatory act itself. *Id.* at *10. The court further noted that while the retaliatory act must occur within the limitations period, whether the protected conduct occurred within the statute

show that her grievance concerning the November 2021 forced overtime incident qualifies as opposition activity. She offers only her own argument, rather than the grievance itself, to demonstrate that the grievance actually raised unlawful sex-based discrimination as an issue. Without the entire grievance, the Court cannot determine whether Baggett opposed an unlawful employment practice. While Defendants attach the grievance as part of an exhibit, it includes only the first page, which does not mention discrimination.[9] (ECF No. 28-6 at PageID.282.) Finally, Baggett's resignation letter and exit interview responses do not qualify as opposition activity. The resignation letter cites a "lack of accountability" and BCSD's failure to staff certain areas of the county to provide adequate backup, but it does not mention unlawful activity such as discrimination. *See Vargas v. Dillard's Dep't Store*, No. 3:07-0737, 2008 WL 2279929, at *12 (M.D. Tenn. May 30, 2008) ("Vague complaints of wrongful conduct or complaints which do not specifically complain about unlawful activity are simply insufficient to constitute protected activity."). Baggett's answers to the exit interview similarly cannot be considered opposition activity. Her allegations of a "toxic work environment," "corruption," nepotism and cronyism, and the administration's "lack of honesty, morals, and integrity" do not amount to an allegation that Defendants were engaging in an unlawful employment practice.

### 2.      Adverse Action

The scope of adverse action in retaliation cases is broader than what may be considered adverse in actions affecting "the terms, conditions, or status of employment" pursuant to Title

---

of limitations is not relevant to the timeliness of the retaliation claim. *Id.* This makes sense, particularly in Title VII cases, because the 300-day limitations period requires that the charge be filed "within three hundred days after the *alleged unlawful employment practice* occurred." 42 U.S.C. § 2000e-5(e)(1) (italics added). Protected activity does not constitute an unlawful employment practice.

[9] While Baggett mentioned some of the male comparators in her interview with Lt. Campbell, she did not mention unlawful discrimination. (ECF No. 28-6 at PageID.270.)

VII's substantive antidiscrimination provision. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61 (2006); *see also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008) (adverse actions in retaliation cases are not "limited to [the] narrow definition of an 'adverse employment action' that includes only actions affecting the terms, conditions or status of employment"). An action is adverse under the antiretaliation provision if it could "well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57. However, such action still must be materially adverse, meaning that an individual is protected from "retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67.

In both her complaint and response to Defendants' motion, Baggett identifies the adverse action as: (1) failing to honor her requests for backup during dangerous situations she encountered while on duty; and (2) revoking her arrest certification. (ECF No. 1 at PageID.18; ECF No. 30 at PageID.402.) There is no question that both of these actions qualify as adverse for purposes of a retaliation claim as they do not amount to "petty slights or minor annoyances." *Id.* at 68. Therefore, Baggett satisfies the second element of her claim.

### 3.    Causal Connection

Baggett's claim fails on the third element for lack of a causal connection. As set forth above, the only protected conduct at issue is Baggett's November 2016 complaint about Sgt. Yech's bullying and harassment and her March 15, 2022 EEOC charge.

Regarding the first alleged adverse action—failing to honor her requests for backup—Baggett contends that she began to experience it in September 2021. (ECF No. 30 at PageID.402.) Thus, by her own admission, the EEOC charge cannot be causally related to adverse action that occurred (or began occurring) about six months before she filed the charge. This leaves the complaint about Sgt. Yech. When an adverse employment action occurs soon the employer learns

of protected activity, that temporal connection can "constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* The time Baggett claims she began experiencing delays in, or failures to honor her requests for, backup (September 2021) is too remote from her complaint about Sgt. Yech (2016) to provide evidence of causation. *See Robinson v. Quicken Loans, LLC*, No. 21-1392, 2022 WL 4234072, at *7 (6th Cir. Sept. 14, 2022) (affirming grant of summary judgment based on lack of a causal connection where the plaintiff began making complaints two years before her termination and saw human resources most recently about five months prior to the termination); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) ("A lapse of more than two years between the protected activity and the adverse employment action is simply insufficient to show a causal connection based solely on a temporal-proximity theory.") Because temporal proximity alone does not suffice here, Baggett "must supplement h[er] claim with 'other evidence of retaliatory conduct to establish causality.'" *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Mickey*, 516 F.3d at 525). Baggett has not presented admissible evidence establishing any sort of connection between her complaint about Sgt. Yech in 2016 and her perceived refusals to honor her requests for backup in September 2021.

As noted above, Baggett's admission that she began to experience backup call issues in September 2021 forecloses any argument that her March 15, 2022 EEOC charge motivated retaliatory conduct that was previously occurring. Moreover, while Baggett testified to her belief that Lt. Zehm ignored or delayed her requests for backup calls because she named him in the

18

charge, she admitted that she has no evidence to support this belief. (ECF No. 27-2 at PageID.179.) In fact, Defendants have shown that Lt. Zehm could not have played any part in any retaliation following the EEOC charge because he retired before Baggett filed it. (ECF No. 27-7 at PageID.224.)

As for revocation of Baggett's deputy card, whether temporal proximity sufficed for a causal connection is a closer question, as much less time elapsed between the protected conduct and the adverse action. Nonetheless, even at four months, the Sixth Circuit requires some additional evidence to show causation. *See Blosser v AK Steel Corp.*, 520 F. App'x 359, 363–64 (6th Cir. 2013) (concluding that the four-month period at issue fell into the category of cases requiring a plaintiff to "couple temporal proximity with other evidence to show causation"); *Meadows v. Wahler Auto. Sys., Inc.*, 45 F. Supp. 3d 645, 661 (E.D. Mich. 2014) ("The Sixth Circuit has held that multi-month gaps between protected activities and discharge—like the over four-month gap that exists here—create no more than a 'loose temporal proximity' that is insufficient to create a triable issue [on causation].'" (quoting *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999))). Again, Baggett fails to present additional evidence causally linking Bailey's July 2022 revocation to her March 15, 2022 EEOC charge. In fact, the evidence demonstrates that Baggett's answers to the exit interview, which were not protected conduct, motivated Bailey's decision to revoke her deputy card. (ECF No. 27-6 at PageID.217–18.)

Finally, Baggett's effort to analogize her case to *Mys v. Michigan Department of State Police*, 590 F. App'x 471 (6th Cir. 2014), falls short. In *Mys*, the plaintiff presented evidence linking a series of retaliatory actions to her repeated complaints about a coworker's behavior that the plaintiff alleged was sexual harassment. *Id.* at 479–80. The evidence and retaliatory acts all related back in one way or another to the plaintiff's original harassment complaint. The appeal,

following a trial, focused on the district court's exclusion of evidence on the basis that it was unrelated to the ultimate retaliatory transfer that the district court found was an adverse action. The Sixth Circuit held that, for various reasons, the district court should not have excluded the evidence simply because much of it related to the dismissed sexual harassment claim and occurred before the plaintiff's ultimate transfer. *Id.* at 480–81. Here, by contrast, the Court has not excluded evidence it has determined to be unrelated to Baggett's retaliation claim. Rather, it has found that, over the course of more than five years, Baggett engaged in, at most, two instances of protected activity concerning unrelated issues, which she has failed to show were causally connected to any subsequent alleged adverse action.[10]

## C.      First Amendment Retaliation

Baggett also alleges that Bailey's revocation of her deputy card constituted unlawful retaliation under the First Amendment. In particular, she contends that her statements in her resignation letter to Bailey and her answers to the "exit interview" motivated Bailey to retaliate by revoking her deputy card.

Bailey contends that he is entitled to qualified immunity on this claim. The doctrine of qualified immunity provides that government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999). An "objective legal reasonableness" test is used to determine whether the official could

---

[10] Baggett also mentions her oral complaint about the lack of backup in September 2021. (ECF No. 30 at PageID.405.) This was an oral complaint, and her testimony is equivocal as to whether she framed the complaint as one based on a gender-based disparity in response times or whether it simply focused on the incident(s) in question. (ECF No. 27-2 at PageID.172–73.) Regardless, she fails to present evidence causally connecting this complaint to an adverse action.

reasonably have believed his conduct was lawful. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The qualified immunity inquiry requires a court to decide whether the facts as alleged or shown make out a constitutional violation and whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either prong of the inquiry without regard to sequence. *Id.* at 236. Here, qualified immunity may be decided on the first prong alone.

To state a claim for First Amendment retaliation, a plaintiff ordinarily must demonstrate that: (1) she engaged in constitutionally protected conduct; (2) she suffered an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection exists between the first two elements. *King v. Zamiara*, 680 F.3d 686, 694 (6th Cir. 2012). A public-employee plaintiff, however, must show more. "'While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions.'" *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004) (quoting *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003)) (internal citations omitted). To be actionable, a public employee's speech must clear three hurdles. First, it must "address[]" a matter of public (rather than private) concern." *DeCrane v. Eckart*, 12 F.4th 586, 595 (6th Cir. 2021) (citing *Connick v. Myers*, 461 U.S. 138 (1983)). Second, the plaintiff must engage in the speech in her capacity as a private citizen rather than pursuant to her job duties. *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006)). Finally, if the speech clears the first two hurdles, the plaintiff must show that, under so-called *Pickering* balancing, her speech interests

21

outweigh the employer's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). These are questions of law for the court to decide. *Haddad v. Gregg*, 910 F.3d 237, 244 (6th Cir. 2018). As set forth below, Baggett's claim fails on the first two inquiries.

### 1.     Public Employee or Private Citizen

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. This holds true even if the speech is a matter of public concern. *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) (citing *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 545 (6th Cir. 2007)). When reviewing an employee's statement under *Garcetti*, a court "must consider both its content and context—including to whom the statement was made—to determine whether the plaintiff made the statement pursuant to her individual duties." *Id.* (citing *Weisbarth*, 499 F.3d at 545). It is not enough that the employee's speech was based on information that he learned in the course of his public employment. *Lane v. Franks*, 573 U.S. 228, 239 (2014). Rather, "[t]he critical question under *Garcetti* is whether the speech at issue is ordinarily within the scope of [the] employee's duties, not whether it merely concerns those duties." *Id.* at 240.

"Determining whether an employee speaks as a private citizen or as a public employee can be challenging." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017) (citing *Boulton v. Swanson*, 795 F.3d 526, 533 (6th Cir. 2015). In deciding the issue, however, courts look "to all of the circumstances surrounding the speech." *DeCrane*, 12 F.4th at 595–96 (citing *Fledderjohann v. Celina City Sch. Bd. of Educ.*, 825 F. App'x 289, 293–98 (6th Cir. 2020)). The Sixth Circuit has

recognized a non-exhaustive list of "who, where, what, when, why, and how" considerations to aid the analysis. *Mayhew*, 856 F.3d at 464. They are "the speech's impetus; its setting; its audience; and its general subject matter." *Id.* (collecting cases).

Before addressing the foregoing factors relative to the resignation letter and the "exit interview" responses, the Court considers Baggett's contention that the public-employee framework does not apply here because she was a former employee at the time she engaged in the subject speech. (ECF No. 30 at PageID.410.) This assertion is only partially true. Baggett's resignation letter conveyed her two-week notice to Bailey. (ECF No. 27-10 at PageID.236.) She thus remained an employee at the time she sent the resignation letter. While Baggett is correct that she was a former employee at the time she submitted her answers to the "exit interview," she would have engaged in such speech only because of her employment with the County; a private citizen would never be asked to respond to, and could provide no meaningful input on, such questions. In other words, Baggett's speech in her response "owe[d] its existence to . . . [her] professional responsibilities." *Garcetti*, 547 U.S. at 421. Moreover, Baggett overlooks the fact that at the time she responded to the "exit interview," she had not completely severed her relationship with Bailey and the County. That is, she was still deputized under authority of the Sheriff's Office with authority to effect arrests in the name of the Sheriff. Mich. Comp. Laws § 51.70; *see also People v. Oliver*, 192 Mich. App. 201, 204 (1991) (police officer deputized by county sheriff acted under the same authority as a deputy sheriff actually employed by the county sheriff's department).

The factors, as applied to the resignation letter, show that Baggett was acting pursuant to her official duties as a public employee. First, the impetus behind the resignation letter was to notify Bailey that she would be ending her employment with BCSD and to provide her reasons for terminating her employment. Baggett's purpose was central to the employment relationship.

Second, this was not a letter to the editor that Baggett sent from her private email account. Rather, she printed the letter on Sheriff's Office letterhead at the office and sent it to Bailey from her County email address. (ECF No. 27-2 at PageID.173.) *See DeCrane*, 12 F.4th at 596 ("On-the-clock speech at the employer's place of business is more likely to be speech as a government agent as compared to off-the-clock speech away from the office."). Third, the letter was directed to Bailey, the Sheriff. "[W]hen a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Mayhew*, 856 F.3d at 465 (internal quotation marks omitted); *see also DeCrane*, 12 F.4th at 596 ("Speech to supervisors is more likely to be speech as a government agent as compared to speech to outside individuals."). Last, the content of the letter, which complained about administrators, other deputies, and working conditions, was "nothing more than 'the quintessential employee beef: management has acted incompetently.'"[11] *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir. 2007) (quoting *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988)).

As for the "exit interview" responses, as noted, Baggett submitted them to the County to provide feedback on her experience as an employee. The speech was directed only to the County and its human resources department; Baggett did not share her answers with anyone else or post them publicly. (*Id.* at PageID.177.) Finally, as with her resignation letter, her responses demonstrate her dissatisfaction with her employment experience and how the BCSD was run. In

---

[11] Baggett's reliance on *Swafford v. Fuller,* No. 1:17-cv-541 (W.D. Mich. Nov. 30, 2018) (ECF No. 30-3) is misplaced, as in *Swafford*, Judge Neff found the plaintiff's speech to address matters of public concern because it was political speech made outside of the workplace. Thus, *Swafford* is not applicable here.

short, the "who, where, what, when, why, and how" of Baggett's speech demonstrate that it is not entitled to First Amendment protection. *See Mayhew*, 856 F.3d at 464.

### 2.    Matter of Public or Private Concern

In *Connick*, the Supreme Court held that speech addresses "a matter of public concern" when it "relat[es] to any matter of political, social, or other concern to the community." 461 U.S. at 146. In other words, it is protected where "it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of government." *Farhat*, 370 F.3d at 590. "Such matters of public concern are to be contrasted with internal personnel disputes or complaints about an employer's performance." *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001).

Baggett's resignation letter involved a matter of personal interest, not a matter of public concern. She made statements critical of "some [in] administration" and "other deputies." Her observation that "the more you mess up the more you are rewarded at this department," concerned her displeasure with her employer's performance. Baggett's criticism about BCSD's "failure to staff certain areas" of the County and "lack of adequate backup" leading to situations in which deputies could be killed also addressed a matter of personal interest.

In *Albert v. Mitchell*, 42 F. App'x 691 (6th Cir. 2002), the Sixth Circuit held that a prison employee's complaint about prison officials' failure to support corrections officers in emergency situations was a matter of personal interest to corrections officers rather than a matter of public concern. The court noted that the plaintiff did not assert that prison officials' failure might lead to prisoner escapes, which in turn could be dangerous to the public. *Id.* at 693–94. Here, as in *Albert*, Baggett's concern addressed deputy safety, not concern for the public. *See Basso v. State of Mich. Dep't of Corrs.*, No. 2:08-cv-75, 2009 WL 929028, at *9 (W.D. Mich. Apr. 3, 2009) (citing *Albert*

and concluding that the plaintiff corrections officer failed to show that his complaints about the safety and security of the prison concerned the public welfare).

Baggett's "exit interview" responses similarly show that they were limited to her personal complaints about how the Sheriff's Office operated, rather than raising a matter of public concern. Despite her use of the term "corruption," the overall import of her responses—complaining about some administrators being unqualified and needing to step down or be replaced—shows that they were nothing more than an "employee grievance concerning internal office policy" that is not entitled to First Amendment protection. *Connick*, 461 U.S. at 154.

## IV.   Conclusion

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment and dismiss Baggett's complaint with prejudice.

A separate order will enter.


Dated: March 20, 2024                                      /s/ Sally J. Berens
                                                          SALLY J. BERENS
                                                          U.S. Magistrate Judge

26